Rosario SPATOLA, Petitioner,

v.

UNITED STATES, Respondent.

Nos. 89–CV–4056 (JRB), 89–643–M (JLC).

United States District Court, E.D. New York.

July 9, 1990.

Edward S. Panzer, New York City (Lionel R. Saporta, Elan Gerstmann, Bettina Schein, of counsel), for petitioner Rosario Spatola.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. (Eric Friedberg, Asst. U.S. Atty., of counsel), for U.S.

## MEMORANDUM–DECISION & ORDER

BARTELS, District Judge.

In general, United States extradition law imposes several substantive requirements on all requests for extradition before they may be granted. Three of these requirements are that: (1) the offense be "extraditable" under the applicable treaty; (2) the offense satisfy so-called "dual criminality;" and (3) there be probable cause that the relator committed the crime for which he is sought. M. Bassiouni, *International Extradition* 319 et seq. (1987). In this case the Court is called upon to decide, as against these requirements, whether the

certification of the extradition of one Rosario Spatola was proper.

## INTRODUCTION

Petitioner Rosario Spatola brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. He challenges the legality of an order of United States Magistrate John L. Caden certifying the request of the Republic of Italy for Spatola's extradition pursuant to the Treaty on Extradition between the Government of the United States of America and the Government of the Republic of Italy, Oct. 13, 1983, ___ U.S.T. ___, T.I.A.S. No. 10837 (the "Treaty").

The Magistrate found that Spatola was extraditable to Italy to serve the remainder of the sentence imposed on him for convictions of "association" to commit crimes and "association" to commit crimes of drug trafficking. Spatola claims that extradition for these convictions is not proper because, on the basis of the record submitted by Italy, there is no probable cause that Spatola committed these crimes, and the acts for which he was convicted do not satisfy dual criminality in that they are not illegal under American criminal law.

## FACTS

On June 6, 1983, in Italy, Spatola was convicted of three crimes: (1) "association" to commit crimes; (2) "association" to commit crimes of drug trafficking; and (3) failure to surrender foreign currency.[1] He was sentenced to 13 years' imprisonment, plus an 80–million lire fine, with 2 years of the sentence to be "remitted." Spatola spent four years, three months, two days in jail, and then, on September 28, 1984, was released pending appeal.[2] After his release on bail pending appeal, Spatola was convicted, on December 4, 1984, of an additional charge of bribing a public official, in violation of Article 319 of the Italian Penal Code.[3] The conviction stemmed from his

---

1. SD 29; 116–20. Citations to "SD" refer to sequentially-numbered pages in the bound volume of English language "Supporting Documents" which the Government adduced as its Exhibit 1 at the extradition hearing.

 Article 416 of the Italian Penal Code provides:

 When three or more persons associate for the purpose of committing more than one crime, those who promote or constitute or organize the association shall be punished, for that alone, by imprisonment for from three to seven years.

 For the act of participating in the association alone, the punishment shall be imprisonment for from one to five years.

 The leaders shall be subject to the same punishment prescribed for the promoters.

 If the associates roam the countryside or public roads in arms, the term of imprisonment shall be for from five to fifteen years.

 The punishment shall be increased if the number of associates is ten or more.
 SD 116.

 Italian Law No. 685 of December 22, 1975, provides:

 When three or more persons conspire together for the purpose of committing more than one offense among those foreseen in [the penal laws dealing with narcotics trafficking], those who promote, form, organize or finance the conspiracy shall be punished, for this alone, by imprisonment for not less than fifteen years and by a fine of a hundred million lire to four hundred million lire.

 For the sole fact of taking part in the conspiracy, the penalty shall be imprisonment for three to fifteen years and a fine of 20 million to a hundred million lire.

 The leaders shall be liable to the same penalty fixed for the promoters.

 The penalty shall be increased if the number of associates is ten or more or if among the participants there are persons addicted to narcotic or psychotropic drugs.

 If the association is armed the penalty, in the cases indicated in the first and the third paragraphs of the present article, may not be less than 20 years' imprisonment and, in the case foreseen in the second paragraph, than 5 years' imprisonment. An association or conspiracy is considered armed when three or more participants possess arms, or even when the arms are concealed or kept in a place of deposit.
 SD 117–18.

 Decree Law No. 31 of March 4, 1976, provides, in pertinent part:

 Any person who, in violation of currency regulations, fails to hand over within thirty days, to the Italian Exchange Office, any foreign currency, however acquired or held in the national territory, shall be subject to [a term of imprisonment of one to six years and to a fine of twice to four times the value of the currency not handed over].
 SD 119–20.

2. SD 33.

3. Article 319 of the Italian Penal Code provides:

 A public officer who, for omitting or delaying an act of his office, or for doing an act

bribing one Giuseppe Vetere to obtain a contract to build public housing units in Palermo, Italy. In connection with this incident, Vetere was convicted for bribery too.[4]

Thereafter, on December 20, 1984, the Court of Appeal of Palermo affirmed Spatola's June 6, 1983, conviction, but reduced the sentence to 10 years, with another two years to be "remitted."[5] However, instead of returning to prison after the appeal, Spatola fled to the United States, and on March 12, 1986, the District Attorney General at Palermo issued a warrant for Spatola's arrest for him to serve the remainder of his sentence for the June 6, 1983, conviction.[6]

On May 21, 1987, the Investigative Magistrate at the Tribunal of Palermo, Italy, issued another warrant for Spatola's arrest. This warrant charged Spatola under Article 319 of the Italian Penal Code with paying a 50 million lire bribe to a public official, one Vito Ciancimino, to obtain approval for Spatola's company's construction

of public housing units in Sperona, Italy. The facts and circumstances of the Ciancimino "bribe" were, apparently, identical to those involved with the Vetere "bribe."[7]

However, on October 26, 1987, the Court of Appeal of the District of Palermo reversed Spatola's December 4, 1984, conviction for bribing Vetere, holding that, based on the evidence, he could only have been convicted of a lesser form of bribery, i.e., a "gratuity" under Article 318 of the Italian Penal Code, which apparently forbids the giving or taking of anything of value by a public official for performing a duty imposed by law.[8] The court held that the statute of limitations had run on this lesser charge of "gratuity" under Article 318, and therefore dismissed the case entirely.[9]

On December 2, 1988, by a complaint made under oath by an Assistant United States Attorney, the Government obtained a "provisional" warrant for Spatola's arrest from a United States Magistrate in the District of New Jersey.[10] The complaint

---

contrary to his official duties, receives, for himself or a third person, money or any other thing of value, or accepts a promise thereof, shall be punished by imprisonment for from two to five years and a fine of 600,000 to 4,000,000 lire.

The punishment shall be increased if the act results:

(1) in conferring public employment, salaries, pensions, honors, or in the conclusion of a contract in which the administrative body of which the officer is part is an interested party; or

(2) in favor or prejudice to one of the parties to a civil, penal or administrative proceeding.

The punishment of imprisonment for from six to twenty years and a fine of not less than 5,000,000 lire shall be imposed if the act resulted in a conviction and sentence to life imprisonment or to imprisonment. [The punishment of death shall apply if the act resulted in a sentence to the punishment of death.]

Whenever the public officer receives the money or thing of value for having acted contrary to his official duties, or for having omitted or delayed an official act, the punishment shall be imprisonment for from one to three years and a fine of from 40,000 to 400,-000 lire.

SD 19. Article 321 of the Italian Penal Code makes Article 319 applicable to non-officials, providing:

The punishments prescribed in the first paragraph of Article 318, and Articles 319 and

320 shall also apply to one who gives or promises the money or other thing of value to a public officer or person charged with a public service.
SD 20.

**4.** SD 1.

**5.** SD 25–26.

**6.** SD 29–31.

**7.** SD 8–12.

**8.** *See* Government's Exhibit 6 at ¶ 7, adduced at the extradition hearing.

**9.** *See* Defendant's Exhibits A–1 and A–2, adduced at the extradition hearing.

**10.** "In case of urgency," the Treaty provides for the provisional arrest of "any person charged or convicted of an extraditable offense." Treaty, Art. XII, ¶ 1. The Treaty then proceeds to detail how an application for a provisional arrest warrant is to be made, and sets out the procedures for issuing and executing the warrant. *Id.*

18 U.S.C. § 3184 provides in pertinent part:

Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, *or any magistrate authorized so to do by a court of the United States,* ... may, upon complaint made under oath,

was made at the request of Italy, pending a formal extradition request. The charges for which the provisional arrest warrant was requested and issued was Spatola's "bribe" of Ciancimino and Vetere. Spatola was eventually arrested in this district on May 8, 1989.

On June 9, 1989, United States Magistrate John L. Caden of this District,[11] issued a *Memorandum and Order* denying Spatola's motion to vacate provisional arrest warrant and his application for bail. As to the provisional arrest warrant the Magistrate noted that there is a question among the federal courts as to whether a provisional arrest for extradition has to be upon probable cause as normally required by the Constitution for arrests for violation of the criminal laws of this country. *See Caltagirone v. Grant*, 629 F.2d 739 (2d Cir.1980); Bassiouni at 527. Nevertheless, the Magistrate proceeded to find that the Complaint and Affidavit of Assistant United States Attorney Eric Friedberg established probable cause, holding that the information supplied therein, taken as true, even if hearsay, would justify a reasonable belief that Spatola committed the crime of bribery in Italy.[12] The Magistrate noted that the fact that there may have been an innocent explanation of the evidence was irrelevant to establishing probable cause in extradition. He further held that whether there is "urgency" as required by the Trea-

ty for a provisional arrest warrant[13] is a justiciable question, *see Caltagirone v. Grant*, 629 F.2d at 744 n. 10 (prior extradition treaty with Italy), and, given Italy's assertion that this was a "serious" case of bribery, and since both countries' believed that there was a serious risk that Spatola would flee absent an arrest, the Magistrate found that there was "urgency" in the present case. Accordingly, Spatola's motion to vacate the provisional arrest warrant was denied.

As to the issue of bail, the Magistrate noted that bail in extradition proceedings is only available under "special circumstances" (quoting *Wright v. Henkel*, 190 U.S. 40, 60, 23 S.Ct. 781, 785, 47 L.Ed. 948 (1903)), and "special circumstances" are found "only in the most pressing circumstances and when requirements of justice are absolutely peremptory" (quoting *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir.1986) (in turn quoting *In re Mitchell*, 171 F. 289 (S.D.N.Y.1909))). Considering this legal background, the Magistrate held that the fact that Spatola might not pose a serious risk of flight was not dispositive regarding bail. In any event, the Magistrate found that Spatola did pose a serious risk of flight,[14] denied Spatola's motion for bail, and remanded him pending the determination of the extradition proceedings.

Subsequently, in a document dated June 19, 1989, Italy formally requested the Unit-

---

charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered.

*Id.* (emphasis added).

Local General Rule 40(b)(12) of the District of New Jersey lists, as one of the Duties of Magistrates in Criminal Cases, "conducting extradition proceedings in accordance with 18 U.S.C. 3184."

**11.** The United States Magistrates of this District have been authorized to preside over extradition proceedings by Local Magistrate Rule 9.

**12.** The Magistrate was not then aware of the disposition of Spatola's conviction for "bribing" Vetere.

**13.** *See* n. 10, *supra.*

**14.** The reasons for this finding were that Spatola had: i) entered this country illegally; ii) was denied temporary residence status because he had been convicted in Italy of a conspiracy to sell narcotics and of repeatedly failing to return foreign currency, risking deportation from the United States upon his release; iii) is a fugitive from Italy in connection with the association crimes and the failure to surrender foreign currency of which he had been tried, convicted, and sentenced, but skipped bail pending appeal once the appeal was denied; iv) told an agent he would rather be electrocuted than be extradited to Italy when arrested in the present case; and v) said he "could not recall" his present address when interviewed by the pretrial service officer after his arrest on the provisional warrant.

ed States Department of State to extradite Spatola (1) for the charge of "bribing" Ciancimino; and (2) to serve the three years, eight months, and twenty-eight days remaining on his sentence for the association crimes (i.e., "association" to commit crimes, and "association" to commit crimes of drug trafficking) and for failure to surrender foreign currency. This document was received and filed by the United States Attorney's Office on June 22, 1989, which was the expiration date of the time period provided for by the Treaty for Italy to formally request extradition.[15] Documentation in support of all four crimes was forwarded with the June 19, 1989, request.

On June 26, 1989, a preliminary conference was held before the Magistrate, and on July 3, 1989, he issued a *Memorandum and Order* denying Spatola's motions that the provisional arrest warrant be vacated, and that bail be granted. In regard to the arrest warrant, the Magistrate disagreed with Spatola that the formal extradition request had to contain a physical description, photographs, and fingerprints of Spatola, holding, per the Treaty, that these items are required only "if available." [16] He also disagreed with Spatola's contention that, because Italy's formal request for extradition was admittedly incomplete, it was fatally flawed. The Magistrate held that, although incomplete, the formal request was complete enough to meet initial muster under the Treaty, since the Treaty specifically provides Italy with a "reasonable" period of time within which to complete documentation.[17] Finally, in regard to bail, the Magistrate again denied Spatola's application for the reasons set forth in the June 9, 1989, *Memorandum & Order.*

An extradition hearing was held before the Magistrate on August 24, 1989. The Government submitted its exhibits, consisting of the documents in support of Italy's extradition request, and then rested. These exhibits were: (1) Italian documents in support of the extradition request; (2) translations of those documents; (3) certifications that the translations were correct; (4) the declaration of Robin Jo Frank, of the Office of the Legal Advisor for the United States Department of State, containing Italy's formal request for extradition dated June 19, 1989, and a copy of the Treaty; (5) the affidavit of Richard A. Martin, Senior Counsel for International Law Enforcement with the United States Department of Justice, and Justice Attache at the Embassy of the United States in Rome, Italy, averring that, based on the opinion of an Italian investigating magistrate, Spatola was still chargeable with "bribing" Ciancimino despite the reversal of his conviction for "bribing" Vetere; and (6) documents establishing the identity of Spatola as the person sought to be extradited. Spatola's case consisted of a copy of the Italian appellate opinion reversing his conviction for "bribing" Vetere and the live testimony of M. Cherif Bassiouni, Professor of Law at DePaul University in Chicago, who testified regarding extradition law and the criminal law of America and Italy.

In a thorough *Memorandum and Order*, dated October 20, 1989, the Magistrate certified Italy's application to extradite Spatola to serve the remainder of his sentence for the association crimes, but denied Italy's request for extradition on the bribery charge and on the remainder of the sentence imposed for failure to turn over currency.

The Magistrate found that, based on the Italian appellate court's overturning of Spatola's conviction for bribing Vetere, there was not probable cause to believe that Spatola had "bribed" Ciancimino to the degree with which he was charged under Italian law—there was only probable cause to believe that Spatola had committed the lesser type of bribery (i.e., giving a "gratuity") for which he had not been charged and for which the Italian statute of limitations had run.[18]

---

15. *See* Treaty, art. XII, ¶ 4.

16. *Id.,* art. X, ¶ 2(a).

17. *See Id.,* art. XI, ¶ 1.

18. The Treaty, art. VIII, provides that "[e]xtradition shall not be granted when the prosecution, or the enforcement of the penalty, for the offense for which extradition had been requested

The Magistrate then turned to the *convictions* of Spatola for which extradition is sought—i.e., association to commit crimes, association to commit crimes of drug trafficking, and failure to hand over foreign currency—and found, based on the record proffered by the Government on behalf of Italy, that he was unable to make an independent determination regarding probable cause because

> [t]he facts which the Government relies upon to establish probable cause are in reality nothing more than the conclusions reached by the Court of Appeal of Palermo in affirming Spatola's conviction, and the underlying facts upon which the Court's decision was based are not apparent from the opinion submitted by the Government. Without the underlying facts and evidence upon which the Court of Appeal of Palermo and the trial court reached its determinations, this court is unable to make an independent factual finding of probable cause.[19]

He held, however, that such a determination was unnecessary because convictions are conclusive as to probable cause under federal case law (citing *United States v. Clark*, 470 F.Supp. 976 (D.Vt.1979) and *In re Edmondson*, 352 F.Supp. 22 (D.Minn. 1972)) and under the Treaty itself.

Furthermore, relying on a provision of the Treaty that provides that the American crime of conspiracy and the Italian Crime of "association" shall "be extraditable offenses,"[20] and noting the Senate ratification history thereto, the Magistrate found that the Treaty itself declared conspiracy and "association" to be crimes sufficiently analogous to make "association" an offense for which extradition would lie. As to the failure-to-surrender-foreign-currency conviction, however, the Magistrate determined that the offense did not satisfy dual criminality, there being no American

analogue for it. In sum, the Magistrate granted certification of Italy's extradition request on the association crimes, but denied certification in all other respects.

As there is no direct appeal available from a certification of extradition, *Collins v. Miller*, 252 U.S. 364, 369, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920); *Shapiro v. Ferrandina*, 478 F.2d 894, 901 (2d Cir.1973), on December 4, 1989, Spatola filed the instant Petition for a Writ of Habeas Corpus, and a Stay of Extradition was immediately granted by District Judge Reena Raggi.

On May 25, 1990, an initial status conference and bail hearing was held before the undersigned, some 382 days after Spatola's provisional arrest.[21] The Court denied Spatola's motion for bail pending its decision on the *habeas corpus* petition, substantially for the reasons set forth by the Magistrate in his *Memorandum and Order* of June 9, 1989. The Government does not contest the Magistrate's rulings as to Spatola's non-extraditability for the Ciancimino "bribe" charge or the foreign currency conviction.[22] Accordingly, there are two issues presented by the petition: (1) dual criminality of the association crimes; and (2) probable cause for the association crimes.

## TREATY PROVISIONS

The Magistrate relied principally on two sections of the Treaty to make the two decisions challenged by the present petition. The first is Article II of the Treaty which provides, in pertinent part:

> 1. An offense, however denominated, shall be an extraditable offense only if it is punishable under the laws of both Contracting Parties by deprivation of liberty for a period of more than one year or by a more severe penalty....

has become barred by lapse of time under the laws of the Requesting Party."

**19.** *Memorandum and Order*, dated October 20, 1989, at 18 n. 7.

**20.** *See* Treaty, art. II, ¶¶ 1, 2.

**21.** Through a series of judicial recusals and illness, the undersigned is the fourth district judge

to whom this petition has been assigned. The case was re-assigned to the undersigned on May 14, 1990.

**22.** *See Government's Memorandum of Law in Opposition to Petition for Writ of Habeas Corpus* at 30 n. 4.

2. .... Any type of association to commit offenses described in paragraph 1 of this Article, as provided by the laws of Italy, and conspiracy to commit an offense described in paragraph 1 of this Article, as provided by the laws of the United States, shall also be extraditable offenses.[23]

The Magistrate relied on the above provisions in finding dual criminality as to the associations crimes, holding that

[t]he only fair reading of this language ... is that the extradition magistrate *may not* make an independent assessment of double criminality pursuant to Article II(1) of the Treaty when the crime for which extradition is sought is criminal association under the laws of Italy or the crime of conspiracy under the laws of the United States. As long as the object of the association is punishable under the laws of both countries, the crime of criminal association under Italian law is extraditable.[24]

The Court, however, finds that while Article II, paragraph 1, does indeed impose a dual criminality requirement, the above provisions do not answer the dual criminality question.

The second pertinent provision of the Treaty is Article X, which is relevant to the probable cause issue. Article X *inter alia* provides that extradition requests for a person who has been *charged but not convicted* of a crime must be accompanied by

a summary of the facts of the case, of the relevant evidence and of the conclusions reached, *providing a reasonable basis to believe that the person sought committed the offense for which extradition is requested....*[25]

Article X also provides, however, that extradition requests for a person already *convicted* of a crime need be accompanied only by

(a) a copy of the judgment of conviction ...;

(b) if the penalty has been pronounced, a copy of the sentence and a statement as to the duration of the penalty still to be served; and

(c) documents establishing that the person sought is the person convicted.[26]

In holding that the certified copy of the appellate opinion affirming Spatola's conviction for the association was sufficient to satisfy probable cause, the Magistrate found it significant that Article X's provision as to extradition for conviction does not require "a reasonable basis to believe that the person sought committed the offense for which extradition is sought," thus apparently obviating the need for an independent probable cause determination by a United States judicial officer in extradition cases involving convictions.[27]

## DISCUSSION

### I.

#### *General Considerations*

Before turning to the specific claims raised by Spatola's petition, it is first necessary to note several general rules of law relating to extradition.

■ As to this Court's jurisdiction, although it is based on the *habeas corpus* statute, 28 U.S.C. § 2241, its review over the certification of extradition is quite narrow, much more narrow, in fact, than the collateral review *habeas* proceedings traditionally provide for American convictions. In the context of extradition, "*habeas corpus* is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925) (Holmes, J.). *See also Shapiro v. Ferrandina*, 478 F.2d at

---

**23.** Treaty, art. II, ¶¶ 1–2.

**24.** *Memorandum and Order*, dated October 20, 1989, at 20–21 (emphasis added).

**25.** Treaty, art. X, ¶ 3(b) (emphasis added).

**26.** *Id.*, art. X, ¶ 4.

**27.** *Memorandum and Order*, dated October 20, 1989, at 19 n. 8.

901. "[T]he judgment of the magistrate, rendered in good faith on legal evidence that the accused is guilty of the act charged, and that it constitutes an extraditable crime, cannot be reviewed on the weight of the evidence, and is final for the purposes of the preliminary examination, unless palpably erroneous in law." *Ornelas v. Ruiz*, 161 U.S. 502, 508–09, 16 S.Ct. 689, 691–92, 40 L.Ed. 787 (1896).

 The reasons for this very limited review are several. First, extradition proceedings are neither criminal trials nor full-blown civil actions; they are administrative in character, and, as such, are not burdened with the legalism and formalities with which American courts are familiar. *See Wright v. Henkel*, 190 U.S. 40, 57, 23 S.Ct. 781, 784, 47 L.Ed. 948 (1903); I *Wigmore On Evidence* § 4(6) at 75 (1983); Fed.R. Evid. advisory committee note. For instance, the Federal Rules of Criminal Procedure are not applicable to extradition proceedings, Fed.R.Crim.P. 54(b)(5); nor are the Federal Rules of Evidence, Fed.R.Evid. 1101(d)(3)—thus, hearsay is freely admissible. *Shapiro v. Ferrandina*, 478 F.2d at 905; *In re Ryan*, 360 F.Supp. 270, 273 (E.D.N.Y.) *aff'd*, 478 F.2d 1397 (2d Cir. 1973). Accordingly, it is a mistake for extradition *habeas* courts to suppose that the legal process due to a relator in extradition is anywhere near the "due process" American courts afford criminal defendants. As Justice Holmes wrote in *Glucksman v. Henkel*, 221 U.S. 508, 31 S.Ct. 704, 55 L.Ed. 830 (1911):

> It is common in extradition cases to attempt to bring to bear all the factitious niceties of a criminal trial at common law. But it is a waste of time. For while of course a man is not to be sent from the country merely upon demand or surmise, yet if there is presented, even in somewhat untechnical form according to our ideas, such reasonable ground to suppose him guilty as to make it proper that he should be tried, good faith to the demanding government requires his surrender.

*Id.* at 512, 31 S.Ct. at 705. Thus, arguments against extradition which "savor of technicality," *Bingham v. Bradley*, 241 U.S. 511, 517, 36 S.Ct. 634, 637, 60 L.Ed. 1136 (1916), are to be rejected by the *habeas corpus* court.

 The second reason behind the very limited *habeas* review of extradition proceedings is that extradition is primarily an aspect of foreign relations and is therefore directed through diplomatic channels. *See* Bassiouni at 41. Grounded in notions of comity, and formally established by treaty, extradition, like all foreign affairs, is soundly committed to the political branches of government. *See Id. See also Oetjen v. Central Leather Co.*, 246 U.S. 297, 302, 38 S.Ct. 309, 310–11, 62 L.Ed. 726 (1918). Indeed, extradition decisions are so much the especial province of the executive branch that, even after a United States magistrate or district judge has certified an extradition request, the executive branch can refuse the request as a matter of unbridled discretion. *See generally* Bassiouni at 601–04. Accordingly, undue interference with the diplomatic process of extradition by the judicial branch is as unseemly and disruptive of separation of powers and of the foreign relations of the nation as any judicial foray into this very political realm. *See United States v. Curtiss-Wright Export Co.*, 299 U.S. 304, 318–21, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936); *Mackenzie v. Hare*, 239 U.S. 299, 36 S.Ct. 106, 60 L.Ed. 297 (1915); *Holtzman v. Schlesinger*, 484 F.2d 1307 (2d Cir.1973), *cert. denied*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). The role of the judiciary in extradition is simply to determine whether the executive branch is authorized by statute and treaty to honor a particular extradition request. *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936); 18 U.S.C. §§ 3183–3184; Bassiouni at 39–40, 71, 72. In making this determination, then, the Court is particularly mindful of its limited role and of the Government's substantial foreign affairs interest in promoting good relations with Italy by honoring its criminal convictions and recognizing the integrity of its criminal justice system. *See* Senate Comm. on Foreign Relations, Treaty With Italy, S.Rep. No. 33, 98th Cong., 2d Sess.

1–2 (1984), *reprinted in* 24 I.L.M. 1531, 1532. *Cf. Rosado v. Civiletti*, 621 F.2d 1179, 1190 (2d Cir.1980), *cert. denied*, 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980). For while treaty interpretation is a judicial function, *Sullivan v. Kidd*, 254 U.S. 433, 442, 41 S.Ct. 158, 161, 65 L.Ed. 344 (1921), extradition treaties are to be liberally construed to effect their underlying purpose of delivering criminals to justice. *Valentine v. United States ex rel. Neidecker*, 299 U.S. at 10, 57 S.Ct. at 103; *Wright v. Henkel*, 190 U.S. at 57, 23 S.Ct. at 784; *In re Edmondson*, 352 F.Supp. 22, 25 (D.Minn.1972).

█ Finally, since comity—i.e., respect and cooperation between sovereign nations—is at the very heart of extradition, a judicial proceeding in extradition is not the proper vehicle for challenging or questioning the fairness of another country's criminal justice system. The President and the Senate have made the political decision that Italy's criminal justice system comports with basic American notions of fairness and therefore entered into the Treaty, and this Court is bound by the existence of the Treaty to assume that Spatola's trial was fair. *See Glucksman v. Henkel*, 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911). Thus, this Court cannot inquire into the "fairness" of Spatola's conviction since "supervising the integrity of the judicial system of another sovereign nation ... would directly conflict with the principle of comity upon which extradition is based." *Jhirad v. Ferrandina*, 536 F.2d 478, 485 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976). *See also* Bassiouni at 372.[28]

## II.

█ As indicated above, three of the substantive requirements imposed by United States law upon extradition requests are: (1) that the relator be sought for an "extraditable offense;" (2) that the offense satisfy dual criminality; and (3) that there be probable cause that the relator has committed the offense for which he is sought.

The phrase "extraditable offense" is a term of art and means something more than the eventual finding that the relator is in fact extraditable. Bassiouni at 328. Moreover, the requirement that a crime be "extraditable" in order to supply a basis for extradition, is different than the requirement of dual criminality. *Id.* For a crime to be an "extraditable" offense it must be an offense that is either listed or defined as such by the applicable treaty. *Id.* at 329. For a crime to satisfy dual criminality, the act committed by the relator must be criminal in both the requesting and the requested country. *Id.* at 324.

### *"Extraditable Offenses"*

█ With regard to the determination of "extraditability" in this technical sense, the Treaty is a double-method treaty. On the one hand, it uses the so-called "eliminative method" in Article II, ¶ 1, by defining as "extraditable" those offenses which are punishable by imprisonment for more than one year, *see* Bassiouni at 331, and on the other hand, the Treaty uses in Article II, ¶ 2, the so-called "ennumerative method," by specifically naming as "extraditable offenses" conspiracy or association to commit crimes defined in Article II, ¶ 1. Despite the fact that "association" is specifically an "extraditable" offense under the Treaty, it is still necessary to determine whether dual criminality exists. As a noted commentator has explained:

It might be supposed that if two States agree, in a treaty, to a list of offenses for which extradition shall take place, they would include only those acts which are crimes in both States. However, questions nevertheless may arise. *Certain acts may, under the law of the requesting State, constitute a listed treaty offense while, under the law of the requested State, the same acts may constitute no crime or, more frequently, one not listed in the treaty.*

6 M. Whiteman, *Digest of International Law* 773–74 (1968) (emphasis added). As Professor I.A. Shearer has recognized, "the

---

**28.** The Court therefore denies Spatola's request that it hold a hearing to determine whether his trial was fair, *pace Ahmad v. Wigen*, 726 F.Supp. 389 (E.D.N.Y.1989) (Weinstein, J.).

double criminality rule serves the most important function of ensuring that a person's liberty is not restricted as a consequence of offenses not recognized as criminal by the requested State." I.A. Shearer, *Extradition in International Law* 137 (1971). And "[t]he point is by no means an academic one even in these days of growing uniformity of standards...." Shearer at 138.[29] Thus, in specifically naming as "extraditable offenses" association and conspiracy to commit crimes defined in Article II, ¶ 1, the Treaty did not obviate the essentially *ad hoc* inquiry into dual criminality where the crime charged is association to commit a crime punishable by the laws of both countries by more than one year's imprisonment, and the Magistrate erred in so holding.[30] Although the association crimes for which Spatola was convicted are "extraditable" under the Treaty, those offenses must also meet the dual criminality test to be the subject matter for extradition.

### Dual Criminality

To determine dual criminality, the Court must examine the underlying conduct for which Spatola was convicted and determine whether that conduct is illegal under American law. *See* Bassiouni at 349. "[A]n offense is extraditable only if the acts charged are criminal by the laws of both countries." *Collins v. Loisel*, 259 U.S. 309, 311, 42 S.Ct. 469, 470, 66 L.Ed.

956 (1922). In making this determination, however, the court should not limit its inquiry to the name of the charge, but should inquire into the criminal conduct and the crime to which it gave rise. *See Collins v. Loisel*, 259 U.S. at 312, 42 S.Ct. at 470; *United States ex rel. Rauch v. Stockinger*, 269 F.2d 681, 685–87 (2d Cir.), *cert. denied*, 361 U.S. 913, 80 S.Ct. 257, 4 L.Ed.2d 183 (1959); Bassiouni at 340.

The Court finds that the acts for which Spatola was convicted would be illegal if committed here. This is clearly revealed by the contents of the Italian appellate court opinion set out at the end of this opinion as an appendix. In sum, however, the Court of Appeal of Palermo found that Spatola "had a foremost role in the association to commit crimes, a role that presupposed his participation also in the specific program to procure very large quantities of American dollars by means of drug trafficking, even though other persons were engaged in the activity of obtaining and exporting the drugs."[31] In the group Spatola was "outstanding for his position as mafia 'manager', near the top level and having the task of large-scale 'launderer'...."[32]

In light of these findings, and the information set forth in the appendix, and without engaging in an unnecessary, comparative law, element-by-element statutory

---

**29.** Shearer notes: "[I]n Western Europe alone sharp variations are found among the criminal laws relating to such matters as abortion, adultery, euthanasia, homosexual behaviour, and suicide." Shearer at 138. Even in the context of extradition among our several states, dual criminality is not a dead issue. *See* N.Y. Times, June 21, 1990, at B4, col. 1 (governor of New York refuses Alabama's extradition request on obscenity charges based on material that would not be deemed obscene in New York).

An example in the record of an "extraditable" offense which would probably not fulfill dual criminality is the portion of the Italian criminal law which enhances the penalty for association where there are persons addicted to narcotic or psychotropic drugs among the participants in the association. *See* n. 1, *supra*. Arguably, if Italy sought the extradition of an addicted association member for conviction under this provision, the United States would deny the request,

because, even though association is an "extraditable offense" under the treaty, under American constitutional law one cannot be punished for being a drug addict. *See Robinson v. California*, 370 U.S. 660 (1962).

**30.** The magistrate felt that legislative history showed that the Treaty's specific declaration of American conspiracy and Italian association as "extraditable offenses" *ipso facto* established dual criminality. *See* Senate Comm. on Foreign Relations, Treaty With Italy, S.Rep. No. 33, 98th Cong., 2d Sess. 3, *reprinted in* 24 I.L.M. at 1532. The cited passage of legislative history, however, seems to go to what an Italian court might hold with regard to an extradition request from the United States predicated upon a RICO or CCE charge, which is irrelevant in this case.

**31.** SD 105.

**32.** SD 111.

analysis,[33] the Court finds that the acts for which Spatola was convicted, and the actions of the group for which Spatola as co-conspirator was liable, are clearly illegal here. *See, e.g.*, 18 U.S.C. § 371 (conspiracy to violate laws of United States); 18 U.S.C. § 874 (kickbacks from public works employees); 18 U.S.C. § 875 (interstate communication of kidnapping ransom demands); 18 U.S.C. § 876 (mailing threatening communications); 18 U.S.C. § 1952 (interstate and foreign travel or transportation in aid of racketeering enterprises); 18 U.S.C. § 1956 (laundering of monetary instruments); 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity); 18 U.S.C. § 1962 (racketeer influenced and corrupt organizations); 21 U.S.C. § 841(a)(1) (manufacture or possession of controlled substances with intent to distribute); 21 U.S.C. §§ 846, 963 (attempt or conspiracy to violate certain drug laws); 21 U.S.C. § 848 (continuing criminal enterprise); 21 U.S.C. § 953 (exportation of controlled substances). The requirement of dual criminality is therefore satisfied.

### III.

### *Probable Cause*

■ Normally, before another country's extradition request can be granted where the relator is charged with a crime, there must be an independent finding by an American judicial officer that there is probable cause that the relator committed the offense for which he is sought. *See, e.g., Neely v. Henkel*, 180 U.S. 109, 123, 21 S.Ct. 302, 307, 45 L.Ed. 448 (1901); *In re D'Amico*, 185 F.Supp. 925, 931 (S.D.N.Y.1960). As stated by the Senate report on the Treaty: "United States extradition treaty practice ... has uniformly required that our treaty partners, in requesting the extradition of a person charged by them, provide sufficient documentation to demonstrate probable cause to believe that the crime for

which extradition is sought was committed and that the person sought committed it." Senate Comm. on Foreign Relations, Treaty With Italy, S.Rep. No. 33, 98th Cong., 2d Sess. 5, *reprinted in* 24 I.L.M. at 1533.

"To establish the level of probable cause necessary to certify one for extradition, evidence must be produced that is 'sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.' *Coleman v. Burnett*, 477 F.2d 1187, 1202 (D.C.Cir.1973)." *In re Extradition of Atta*, 706 F.Supp. 1032, 1050 (E.D. N.Y.1989). Furthermore, "[t]he primary source of evidence for the probable cause determination is the extradition request, and any evidence in it is deemed truthful for purposes of this determination." *Id.* at 1050–51 (citing *Collins v. Loisel*, 259 U.S. at 315–16, 42 S.Ct. at 471–72). A magistrate's finding that there is probable cause will not be overturned so long as there is *any* evidence warranting the finding that there was reasonable ground to believe the accused guilty. *Collins v. Loisel*, 259 U.S. at 315, 42 S.Ct. at 471.

As noted above, although the Magistrate felt that, based on the record before him, he was unable to make an independent determination of probable cause, he nevertheless found that the certified copy of the appellate opinion affirming Spatola's conviction was "sufficient proof that probable cause exists that Spatola committed [the association] crimes, thus satisfying the requirements of 18 U.S.C. § 3184."[34] The Magistrate noted that "[t]his approach is consistent with the Treaty, which requires that an extradition request for a person who has been charged but not convicted of a crime must provide a reasonable basis to believe that the person sought committed the offense for which extradition is sought, but has no such requirement for extradition requests relating to a person who has already been convicted. *See* Articles

33. *See* Senate Comm. on Foreign Relations, Treaty With Italy, S.Rep. No. 33, 98th Cong., 2d Sess. 3, *reprinted in* 24 I.L.M. at 1532 ("it is the nature of the underlying conduct, not its denomination in each country, that is critical to

the application of the dual criminality principle").

34. *Memorandum and Order,* dated October 20th, 1989, at 18.

X(3)(b) and X(4) of the Treaty." [35] Spatola claims that an independent determination of probable cause is required by the Constitution, and that the Treaty is unconstitutional insofar as it dispenses with this independent determination.

It is true that the Constitution, to some as yet ill-defined extent, restrains the extradition activities of the United States Government *via* treaty.[36] For while the Constitution declares that both it *and* treaties are the "supreme Law of the Land," U.S. Const. art. VI, the Second Circuit has unequivocally declared that "although the Constitution cannot limit the power of a foreign sovereign to prescribe procedures for the trial and punishment of crimes committed within its territory, *it does govern the manner in which the United States may join the effort.*" *Rosado v. Civiletti,* 621 F.2d at 1195 (emphasis added). Contrary to Spatola's argument, however, the requirement that there be probable cause in order to extradite "has not yet been interpreted as emanating from the Fourth Amendment." Bassiouni at 552. And while the Second Circuit has expressed "grave questions" concerning the constitutional propriety of a treaty that would allow provisional arrest in extradition without probable cause, *Caltagirone v. Grant,*

629 F.2d at 748, 748 n. 19, the Court has no such "grave" questions here where there has been a conviction, even if the probable cause requirement in extradition is required by the Constitution.

The Treaty does require probable cause for extradition on post-trial convictions just as for extradition on pre-trial charges, and the Treaty's different treatment of extradition requests in each instance is merely meant to avoid a statement of the obvious. In the case of mere charges, no adjudication of guilt has yet been made against the relator and thus there is a need for the so-called "independent" determination of probable cause similar to preliminary hearings in American criminal cases. Where, however, there has been a judgment of conviction, there is no need for an "independent" determination of probable cause: the relator's guilt is an adjudicated fact which *a fortiori* establishes probable cause.[37] Thus, a certified copy of an appellate court opinion affirming a relator's conviction is enough to establish probable cause.[38] The same is true for a certified copy of a judgment of conviction. *See United States v. Clark,* 470 F.Supp. 976, 978 (D.Vt.1979); *In re Edmondson,* 352 F.Supp. at 24.[39] *Cf.* Shearer at 151.

35. *Id.* at 19 n. 8.

36. *See, e.g., Sahagian v. United States,* 864 F.2d 509, 513 (7th Cir.1988) (Bill of Rights limits government's treaty-making power as well as actions taken by federal officials pursuant to treaties); *Plaster v. United States,* 720 F.2d 340, 348 (4th Cir.1983) (same), Henkin, *Rights: American & Human,* 79 Colum.L.Rev. 405, 411 (1979) (treaty power cannot "trump" Bill of Rights since rights guaranteed therein antecede the Constitution and are above government abrogation); Bassiouni at 40 ("To date, there has never been a conflict between an extradition treaty and a constitutional provision, and in the case of such a conflict the Constitution would presumably prevail"). *Cf. Reid v. Covert,* 354 U.S. 1 (1957); *Power Auth. of New York v. Federal Power Comm'n,* 247 F.2d 538 (D.C.Cir. 1957). *But see Missouri v. Holland,* 252 U.S. 416 (1920).

37. *See Declaration of Mary Ellen Warlow, Senior Counsel for International Law Enforcement, United States Department of Justice,* dated July 7, 1990 at 3, and exhibit thereto (quantum of proof for conviction in Italy is considerably more demanding than American standard of "probable cause;" Italian judge must be certain or secure of defendant's guilt; where there is any reasonable possibility of innocence, defendant must be acquitted). *See also* Ital. Const. Title I, art. 27, cl. 2 (accused not considered guilty until judgment imposed).

38. *Cf. Compton v. Ide,* 732 F.2d 1429, 1434 (9th Cir.1984) (one found guilty of a charge is estopped from claiming lack of probable cause for arrest and prosecution on that charge); *Brewster v. Woodward & Lothrop, Inc.,* 530 F.2d 1016, 1017 (D.C.Cir.1976) (criminal conviction establishes, without other proof, probable cause); *Turner v. Green,* 704 F.Supp. 139, 141 (N.D.Ill.1988) (conviction establishes probable cause); *Konon v. Fornal,* 612 F.Supp. 68, 71 (D.Conn.1985) (conviction is conclusive proof of probable cause).

39. And the same rule obtains in the context of American interstate extradition where probable cause is as much a requirement as in the context of international extradition. *See, e.g., Ex parte Gray,* 426 S.W.2d 241 (Ct.Crim.App.Tex. 1968) (copy of indictment together with judgment of conviction sufficient to extradite to

However, even if an "independent" determination of probable cause was required, the contents of the opinion of the Court of Appeal of Palermo, as set forth *supra* in the section on dual criminality and in the appendix, assuredly provided enough information to permit such a determination. "Probable cause" in the context of this case is nothing more than a reasonable, conscientious belief by a person of ordinary prudence and caution that Rosario Spatola has committed the crimes for which Italy seeks his extradition. There is no doubt that Spatola has been convicted in Italy of association to commit crimes and association to commit crimes of drug trafficking. There is, in the record, a certified copy of the appellate court opinion affirming his conviction for these crimes, and the appellate opinion sets forth much more than a mere declaration that Spatola committed the association crimes and was properly found guilty. The evidence, findings, and holding recited in the Italian court opinion clearly set out the nature and activities of the association, and Spatola's role in and efforts on behalf of the association, thus amply justifying a reasonable belief that Spatola committed the association crimes. *See Shapiro v. Ferrandina*, 478 F.2d at 905 (hearsay admissible in extradition proceedings); *Collins v. Loisel*, 259 U.S. at 315–16, 42 S.Ct. at 471–72 (evidence submitted by requesting state deemed truthful for purposes of probable cause determination); *Glucksman v. Henkel*, 221 U.S. at 512, 31 S.Ct. at 705 (court bound by existence of extradition treaty to assume requesting state's criminal procedure is fair).

In sum, the Magistrate was correct in holding that the Italian appellate court opinion affirming Spatola's conviction was sufficient to establish probable cause.

another state); *Burnette v. McClearn*, 162 Colo. 503, 427 P.2d 331, 332 (1967) (copy of judgment of conviction was all that was necessary to support extradition); *Ex parte Glasper*, 170 Tex. Crim. 628, 343 S.W.2d 712 (1961) (same); *Travis v. People*, 135 Colo. 141, 308 P.2d 997 (1957) (where extradition request contained no indictment, information, or affidavit, copy of judgment of conviction was sufficient to support extradition).

## CONCLUSION

The Magistrate correctly certified the extradition request of Italy as to Rosario Spatola's conviction for association to commit crimes and for association to commit crimes of drug trafficking since the association crimes are "extraditable" under the Treaty and satisfy the requirement of dual criminality; and since probable cause that Spatola committed the association crimes has been established. Accordingly, Spatola's petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2241 is DENIED, and the petition is DISMISSED. However dismissal of the petition is STAYED for ten days to permit application for a further stay from the Court of Appeals.

SO ORDERED.

## APPENDIX

A careful examination of the appellate court opinion reveals the following:

1) The Gambino, Inzerillo, & DiMaggio families were joined together in a "single organic group" for criminal purposes.[40] The group was engaged in organized crime in Palermo, Italy, New York, and New Jersey.[41] The group was "an association of mafia type," [42] bound by bonds of silence, "family," and "the full and exclusive devotion of its associates to the common cause." [43] Spatola once extolled the virtues of the mafia, "asserting it to be good and not bad, and giving an apologetic definition of 'omerita' (conspiracy of silence)...." [44]

2) On January 16, 1980, 24 kilograms of heroin, contained in two suitcases, were seized in New York. The group was responsible for the importation of this heroin from Palermo to New York via

**40.** SD 36 et seq.

**41.** SD 36–37.

**42.** SD 90.

**43.** SD 82–83, 85–86, 94.

**44.** SD 90–91.

Rome.[45]

3) In March of 1980, a 40–kilogram seizure of heroin was made in Milan when the group attempted to mail it to Gambino associates in New York.[46]

4) The group engaged in the purchase of base morphine in Milan, and then transported it to Palermo to manufacture heroin.[47]

5) The group was also involved in two other episodes of heroin trafficking. These episodes, together with the January and March 1980 incidents, although differing in the *dramatis personae* of minor characters, all centered around Salvatore Inzerillo (in Palermo) and the Gambinos (in New York).[48] Furthermore, legally authorized electronic surveillance of an Inzerillo-owned business telephone revealed coded conversations about drug trafficking and money laundering.[49]

6) The group engaged in extortion in connection with construction projects whereby contractors were forced to pay "commissions" or peace money.[50] In fact, it was, in part, "the methods used by SPATOLA ... to obtain the award of the [a particular] contract and to force the holder to let him build on [a particular tract of land]" that evinced that the group "is an association of mafia type."[51]

7) Spatola, a mutual cousin of Salvatore Inzerillo and Rosario Gambino,[52] occupied a high position in the group. Although he did not involve himself directly in drug trafficking, he played the role of a respectable businessman in the construction trade, thereby enabling the group to launder large amounts of foreign currency representing the proceeds of wholesale distribution of drugs.[53]

8) Spatola was one of the "foremost members of the group of families.... [H]e came to have, in the organization, the main task of recycling foreign currency and the illicit proceeds received—behind a facade of apparent respectability—by means of exchange operations and using companies of which he was the owner or co-owner."[54] In this way, and in the course of only ten years, Spatola went from "issuing a dud check to possessing sufficient capital and reliability to construct large buildings and to organize big worksites, and to have so much good fortune as to obtain, on the one hand, lands against deferred payment, and on the other hand supplies on credit and considerable bank loans without adequate guarantees."[55] Spatola admitted associating with Inzerillo and Gambino, and explained that the large amounts of foreign currency given by them to him represented their partners' contribution to his company.[56] This explanation, however, was untruthful.[57]

9) Spatola was perfectly well aware that his relations (DiMaggio, Inzerillo, Gambino) were members of the mafia and he deliberately joined the association to play the chief role of director of mafia building contractors. And the proceeds of unlawful trafficking, including the dollars earned in drug running, were also to be used in these companies. And the origin of these proceeds ... could not have been unknown to Spatola, in view of the notorious—to say the least—figures of his cousins, and given that such a huge quantity of American dollars could have come from nowhere else.[58]

45. SD 38–39.

46. SD 39.

47. SD 48.

48. SD 55.

49. SD 40.

50. SD 48–49.

51. SD 89–90. *See also* SD 101.

52. SD 88.

53. SD 37, 88–89, 92–94, 97–98.

54. SD 47–48.

55. SD 96.

56. SD 97.

57. SD 97.

58. SD 104.

10) To further the interests of the group, Spatola participated in the sham "kidnapping" of a Michele Sindona in New York, on August 2, 1979. In connection with this incident, Spatola, his brother Vincenzo, Giovanni Gambino, Francesco Fazzino, Sindona himself, and others, were arrested in Italy for aggravated extortion.[59]